## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VANDA PHARMACEUTICALS INC.,
2200 Pennsylvania Avenue NW, Suite 300E,
Washington, DC 20037,

                                Plaintiff,

v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION,
10903 New Hampshire Avenue
Silver Spring, MD 20993;

MARTIN A. MAKARY, M.D., in his official
capacity as Commissioner of Food and Drugs,
10903 New Hampshire Avenue
Silver Spring, MD 20993;

NIKOLAY NIKOLOV, M.D., in his official
capacity as Director of the Office of Immu-
nology and Inflammation,
Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993;

MATTHEW KOWALIK, M.D., in his offi-
cial capacity as Acting Director of the Divi-
sion of Gastroenterology,
Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993;
and

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
200 Independence Avenue SW
Washington, DC 20201,

                              Defendants.

Civ. No.    26-1443

**COMPLAINT**

Plaintiff Vanda Pharmaceuticals Inc. (Vanda) brings this complaint for injunctive and declaratory relief against the Food and Drug Administration (FDA), Martin A. Makary, Nikolay Nikolov, Matthew Kowalik, and the United States Department of Health and Human Services (HHS) and alleges as follows:

**INTRODUCTION**

1. Vanda's drug Nereus$^{TM}$ (tradipitant) is a groundbreaking new therapy approved in 2025 for the prevention of vomiting induced by motion. Nereus$^{TM}$ is the first new pharmacologic treatment in over four decades for people suffering from motion sickness.

2. Nereus$^{TM}$ is a potent and selective antagonist of NK-1 receptors in the central nervous system, directly addressing the biochemical pathway that leads to nausea and vomiting.

3. Nereus$^{TM}$ is also safe. The drug has been studied extensively in animals, in numerous clinical trials in humans, and in cutting-edge models using human-cell "organ-on-a-chip" systems that can predict the long-term toxicology profile of drugs in a matter of days. No relevant or significant safety concerns have emerged. That is in part why FDA has approved it for use by the American public.

4. Vanda is committed to expanding Nereus$^{TM}$'s therapeutic potential in related vomit-inducing conditions as part of its mission of bringing beneficial therapeutics to patients that do not have their medical needs currently met.

5. One such condition is gastroparesis. Gastroparesis is a chronic disorder in which food empties too slowly from the stomach to the small intestine, a phenomenon known as "delayed gastric emptying." Gastroparesis patients often suffer from severe and persistent nausea and vomiting that interferes with normal daily activities. There are currently no FDA-approved long-term treatment options for gastroparesis.

6. Yet FDA recently took a regulatory action—known as a "partial clinical hold"—that prevents Vanda from studying Nereus™'s long-term safety in patients with gastroparesis. This lawsuit challenges that agency action as arbitrary, capricious, and unlawful.

7. FDA provided two reasons for imposing the partial clinical hold, neither of which makes any sense.

8. First, FDA asserted a lack of sufficient nonclinical evidence. FDA stated in conclusory fashion that Vanda had not shown it would be reasonably safe for participants in Vanda's proposed study to take Nereus™ daily for 12 months—a curious conclusion given that Nereus™ is already on the market and may be lawfully prescribed for any use. What little explanation FDA offered for this conclusion only revealed a profound failure of reasoned decisionmaking. In dismissing out of hand Vanda's non-animal studies, FDA failed to engage with key record evidence and violated the core requirement of the FDA Modernization Act 2.0. In so doing, FDA put Vanda to a catch-22: FDA stated that it would accept a non-animal study as an alternative to a long-term animal toxicity study (specifically, a 9-month toxicity study that requires drugging and slaughtering young beagle dogs) *only* if Vanda demonstrated that the non-animal study "characterizes the long-term risk of daily tradipitant use at least as well as" the 9-month dog toxicity study. Vanda, of course, could make that specific showing only by *completing* the 9-month dog toxicity study. That is, in FDA's view, the only way to sufficiently support the safety of Vanda's proposed study without a 9-month lethal dog toxicity study is to complete a 9-month lethal dog toxicity study to prove that the non-dog study functions "as well as" the dog study.

9. This catch-22 is both scientifically and legally untenable. There is no scientific basis for requiring Vanda to validate a human-cell-based microphysiological system study against results generated by testing the same compound *in dogs*, when the purpose of such systems—and

3

nonclinical testing in general—is to better characterize toxicity *in humans*. And legally, FDA's circular "validation" requirement is contrary to the plain text of the FDA Modernization Act 2.0—which treats non-animal models as co-equal alternatives to animal testing, not as inferior methods that must be benchmarked against the very animal studies Congress sought to replace.

10.    FDA's second asserted basis for the hold fares no better. Specifically, FDA stated that two of Vanda's prior clinical studies in gastroparesis patients "strongly suggest lack of effectiveness," and that the proposed clinical study was not designed to be an "adequate and well-controlled trial." But Vanda has never done a study that showed a *lack* of effectiveness. One study showed gastroparesis patients experienced a statistically significant improvement from Nereus™ compared to placebo, and the other study showed a numerical improvement over placebo. FDA's criticism of the proposed clinical study was equally puzzling. The proposed clinical study—like other safety studies that FDA routinely accepts—would randomly assign patients to receive either Nereus™ or the current standard of care, thereby enabling a controlled comparison between the two sets of patients. FDA objected that the proposed study was not "placebo-controlled" but provided no coherent reason why incorporating a placebo control was necessary or appropriate for a 12-month safety study. And FDA's conclusion was particularly arbitrary given that FDA's *own* guidance on studying treatments for gastroparesis expressly recommends precisely the "randomized, controlled, long-term safety study" Vanda proposed.

11.    Given that FDA's stated reasons for imposing the partial clinical hold are patently insufficient to justify its imposition, FDA's partial clinical hold can only be understood as the product of FDA unlawfully misusing two outdated guidance documents.

12.    The first guidance document, a guidance created in the 1990s by the International Council for Harmonisation of Technical Requirements for Pharmaceuticals for Human Use (ICH),

4

requires a 9-month non-rodent toxicity study to support dosing for longer than 6 months in a clinical trial.

13.    FDA's adherence to the ICH Guidance is contrary to law because Congress amended FDA's governing statute in 2022 via the FDA Modernization Act 2.0 to *eliminate* animal testing as a prerequisite for clinical study. Under the statute as amended, animal testing is one way—not the only way—to show that a drug is safe for use in humans.

14.    FDA's adherence to the ICH Guidance is unlawful for a second reason too. FDA treats the ICH Guidance as a binding rule, although it was never subject to notice-and-comment rulemaking procedures. Through FOIA, Vanda has determined that FDA has *never* granted an exception to its animal-study requirement for a drug designed to treat a chronic condition.

15.    The second guidance document that FDA misused here is FDA's recommendation regarding clinical trial designs to support developing drugs for gastroparesis. FDA first issued draft guidance on this topic in 2015, recommending "a placebo-controlled long-term safety study of 12 months' duration." Numerous stakeholders commented that such a lengthy placebo-controlled study would be "unnecessary," "excessive," "not practical," and "hard to justify to patients," "given the chronic relentless nature of the symptoms." In 2019, FDA revised its guidance to eliminate the term "placebo-controlled" and instead call for a "randomized, controlled, long-term safety study of 12 months' duration"—precisely the kind of study Vanda has proposed.

16.    FDA's unlawful and arbitrary action suspending Vanda's planned study will impede Vanda's ability to investigate a promising new drug and eventually deliver it to gastroparesis patients, with no appropriate justification for denying patients this relief. The Court should set aside FDA's action.

**PARTIES**

17.     Plaintiff Vanda Pharmaceuticals Inc. is a global biopharmaceutical company focused on the development and commercialization of innovative therapies to address high-priority unmet medical needs and to improve the lives of patients. Vanda is incorporated in Delaware and maintains its principal place of business in Washington, D.C.

18.     Defendant Food and Drug Administration is an agency of the United States government within the Department of Health and Human Services. The Secretary of Health and Human Services has delegated to FDA the authority to administer the relevant provisions of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* (FDCA). FDA is headquartered in Silver Spring, Maryland.

19.     Defendant Martin A. Makary, M.D., is Commissioner of Food and Drugs. The Commissioner of Food and Drugs has delegated authority to administer the FDCA. He is sued in his official capacity only.

20.     Defendant Nikolay Nikolov, M.D., is Director of FDA's Office of Immunology and Inflammation and a signatory on the partial clinical hold. He is sued in his official capacity only.

21.     Defendant Matthew Kowalik, M.D., is Acting Director of FDA's Division of Gastroenterology and a signatory on the partial clinical hold. He is sued in his official capacity only.

22.     Defendant United States Department of Health and Human Services is a cabinet-level executive department charged with enhancing the health and well-being of all Americans. HHS is headquartered in Washington, D.C.

**JURISDICTION AND VENUE**

23.     Plaintiff brings this suit under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

24.     This case arises under the laws of the United States. The Court has jurisdiction under 28 U.S.C. § 1331.

25. Venue is proper in this district under 28 U.S.C. § 1391(e) because Vanda resides in this district and no real property is involved in this action.

## FACTUAL ALLEGATIONS

### A. Statutory and regulatory background

#### 1. Investigational use of new drugs

26. The Federal Food, Drug, and Cosmetic Act (FDCA) makes it unlawful to "introduce or deliver for introduction into interstate commerce any new drug" unless FDA has approved a new drug application (NDA) for that drug. 21 U.S.C. § 355(a).

27. An NDA must include, among other things, information sufficient to show "whether such drug is safe for use and whether such drug is effective in use." 21 U.S.C. § 355(b)(1)(A)(i). FDA may decline to approve an NDA on certain grounds enumerated in the FDCA, including (1) that the NDA does not include "adequate tests … to show whether or not such drug is safe for use" and (2) "a lack of substantial evidence that the drug will have the effect it purports or is represented to have." *Id.* § 355(d).

28. The FDCA requires FDA to create by regulation an exemption from the general prohibition on distributing unapproved drugs in order "to investigate the safety and effectiveness of [such] drugs." 21 U.S.C. § 355(i)(1). Among other factors, the statute permits FDA to "condition[]" the exemption on the submission "of reports, by the manufacturer or the sponsor of the investigation of such drug, of nonclinical tests of such drug adequate to justify the proposed clinical testing." *Id.* § 355(i)(1)(A).

29. FDA's regulations implementing 21 U.S.C. § 355(i) require the sponsor of a new drug to submit an Investigational New Drug Application (IND) before beginning human clinical trials in the United States. *See* 21 C.F.R. § 312.20. Among other things, an IND must contain information on the drug's chemistry and manufacturing, information on the pharmacological and

toxicological effects of the drug from animal studies and *in vitro* testing, information on any previous human experience with the drug, and a protocol for each planned study. *Id.* § 312.23(a).

30.    By statute, an IND becomes automatically effective 30 days after FDA receives it, allowing clinical trials to commence. 21 U.S.C. § 355(i)(2); *see also* 21 C.F.R. § 312.40(b)(1).

31.    Once an IND is effective, clinical trials are generally conducted in three phases. *See* 21 C.F.R. § 312.21. Phase 1 involves the initial introduction of a new drug into human subjects and is "designed to determine the metabolism and pharmacologic actions of the drug in humans, the side effects associated with the increasing doses, and, if possible, to gain early evidence on effectiveness." *Id.* § 312.21(a)(1). Phase 2 studies are "typically well controlled" and are used to evaluate "effectiveness of the drug for a particular indication … and to determine the common short-term side effects and risks associated with the drug." *Id.* § 312.21(b). Phase 3 studies are expanded trials, designed to "gather … additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." *Id.* § 312.21(c). These "clinical trials alone tak[e] six to seven years on average" to complete. *Biopharmaceutical Research & Development: The Process Behind New Medicines*, PhRMA at 1 (2015), perma.cc/PL5Y-YW7P.

### 2.    FDA "clinical holds"

32.    At any point during the investigation of a new drug, FDA may prohibit the sponsor from beginning or continuing particular investigations by imposing a "clinical hold." 21 U.S.C. § 355(i)(3)(A).

33.    The statute allows FDA to impose a clinical hold in two distinct circumstances. First is where "the drug involved represents an unreasonable risk to the safety of the persons who are the subjects of the clinical investigation." 21 U.S.C. § 355(i)(3)(B)(i). Second, FDA may impose a hold "for such other reasons as [FDA] may by regulation establish." *Id.* § 355(i)(3)(B)(ii).

8

In either case, the agency must "specify the basis for the clinical hold, including the specific information available to [FDA] which serve[s] as the basis for such clinical hold, and confirm such determination in writing." *Id.* § 355(i)(3)(A).

34.    When a clinical hold order is issued, the order "will identify the studies under the IND to which the hold applies, and will briefly explain the basis for the action … and no more than 30 days after imposition of the clinical hold, the Division Director will provide the sponsor a written explanation of the basis for the hold." 21 C.F.R. § 312.42(d).

35.    A clinical trial placed under a clinical hold order "may only resume after FDA … has notified the sponsor that the investigation may proceed." 21 C.F.R. § 312.42(e).

36.    As relevant here, FDA's regulations implementing the statute's clinical hold provision repeat the statute's unreasonable-risk-to-safety grounds for a clinical hold. 21 C.F.R. § 312.42(b)(1)(i). FDA regulations separately provide that FDA may issue a clinical hold if "[t]he IND does not contain sufficient information required under § 312.23 to assess the risks to subjects of the proposed studies." *Id.* § 312.42(b)(1)(iv).[1]

37.    Section 312.23 in turn requires an IND to contain certain toxicological information: "[a]dequate information about pharmacological and toxicological studies of the drug involving laboratory animals or in vitro, on the basis of which the sponsor has concluded that it is reasonably safe to conduct the proposed clinical investigations." 21 C.F.R. § 312.23(a)(8). The regulations do not identify any particular nonclinical toxicology studies that must be conducted before a sponsor concludes that a clinical study in human subjects would be reasonably safe. Rather, the regulations

---

[1]    These standards, which are specific to Phase 1 studies, are incorporated for Phase 2 and Phase 3 studies as well. 21 C.F.R. § 312.42(b)(2)(i).

provide that the "kind, duration, and scope of animal and other tests required varies with the duration and nature of the proposed clinical investigations." 21 C.F.R. § 312.23(a)(8).

38.     FDA's regulations implementing the statute's clinical hold provision also provide that FDA may issue a clinical hold on an "investigation that is not designed to be adequate and well-controlled" if it finds that "[t]he drug has been studied in one or more adequate and well-controlled investigations that strongly suggest lack of effectiveness." 21 C.F.R. § 312.42(b)(4)(iv).

### 3.     *ICH Guidance and FDA Modernization Act 2.0*

39.     FDA has adopted additional guidance requiring lengthy toxicology studies based on the standards issued by an international, private, non-profit association. *See* Ex. 1, FDA, *Guidance for Industry: M3(R2) Nonclinical Safety Studies for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals* (Jan. 2010), perma.cc/ZN95-WBBJ (ICH Guidance).

40.     Under the ICH guidance—which dates to the 1990s—sponsors must conduct a 9-month repeat-dose toxicity study in a non-rodent animal (typically young beagles), even if other studies reveal a lack of significant safety concerns. It states that "[i]n principle … the duration of the animal toxicity studies conducted in two mammalian species (one nonrodent) should be equal to or exceed the duration of the human clinical trials up to the maximum recommended duration of the repeated-dose toxicity studies." ICH Guidance at 7. The guidance's bottom-line conclusion is that "[s]ix-month rodent and 9-month nonrodent studies generally support dosing for longer than 6 months in clinical trials." *Id.*

41.     FDA has interpreted the guidance as imposing a requirement of a 9-month non-rodent study for IND applicants wishing to study a drug in humans for longer than 3 months. *See, e.g., Vanda Pharms., Inc. v. FDA*, 436 F. Supp. 3d 256, 263 (D.D.C. 2020) (describing an FDA clinical hold decision in which FDA "noted that 9-month nonrodent toxicity studies 'are required

… per the ICH Guidance for Industry: M3(R2) Nonclinical Safety Studies for the Conduct of Human Clinical Trials and Marketing Authorization for Pharmaceuticals'").

42.     In previous judicial proceedings, FDA stated that the non-rodent toxicity study requirement is not absolute. Ex. 2, Tr. of Mot. Hr'g at 85:13-16, *Vanda Pharms., Inc. v. FDA*, No. 19-301 (D.D.C. Dec. 13, 2019). Nevertheless, as described in more detail below (*see infra* ¶¶ 147-154), FDA has continued to insist on 9-month non-rodent toxicity studies in virtually every case.

43.     Although FDA has applied the ICH Guidance in nearly every case, FDA has not articulated a scientific justification for its policy—for the simple reason that there is none. The requirement is not, and has never been, supported by convincing evidence of the predictive value of long-term repeat dose animal toxicity studies for predicting toxicity in humans. Indeed, many scientific studies, including some from over ten years ago, have demonstrated that animal toxicity studies are highly inconsistent, if not entirely useless, predictors of toxicity in humans.[2]

44.     FDA has itself undertaken a review of the utility of dog toxicity studies for food additives, concluding that alternatives to dog studies are "potentially less time consuming, less expensive, and perhaps more predictive of human health risk compared to animal models." Ex. 3, B.M. Flannery et al., *Retrospective Analysis of Dog Study Data from Food and Color Additive Petitions*, 14 Reg. Toxicology & Pharmacology, 105523 (Nov. 2023).

---

[2]    *E.g.,* Ex. 4, Jarrod Bailey *et al.*, *An Analysis of the Use of Dogs in Predicting Human Toxicology and Drug Safety*, 41 ALTA 335, 340 (2013) ("This analysis of the most comprehensive quantitative database of publicly-available animal toxicity studies yet compiled, suggests that dogs are highly inconsistent predictors of toxic responses in humans, and that the predictions they can provide *are little better than those that could be obtained by chance*—or tossing a coin—when considering whether or not a compound should proceed to testing in humans.") (emphasis added); Ex. 5, Nina Hasiwa, *Critical Evaluation of the Use of Dogs in Biomedical Research and Testing in Europe*, 28 ALTEX 326, 332 (2011) ("[W]hen the correct definitions of sensitivity, specificity and likelihood ratio are used, the data provide no statistically credible evidence that these animal models [dogs and monkeys] contribute any predictive value.").

45.     For similar reasons, the Environmental Protection Agency (EPA) has moved away from using animal toxicity studies to evaluate the safety of pesticides. An extensive analysis of toxicity studies in dogs that compared findings from 3-month studies to findings from 12-month studies found that 12-month studies "did not provide additional essential toxicity information." 72 Fed. Reg. 60,934, 60,940-41 (Oct. 26, 2007). In 2007, on the basis of that analysis, EPA revised its regulations to eliminate the requirement to conduct chronic toxicity studies in dogs. *Id.*; 40 C.F.R. § 158.500.

46.     And regardless of whether FDA's non-rodent animal study requirement was justified in 1997 when the ICH Guidance was formulated (it wasn't), it certainly has no scientific basis today. There have been significant technological advancements in safety testing since then, and even since 2010 when FDA adopted the revised ICH Guidance. Today myriad technologies exist that allow the effect of drugs on human organ cells to be studied in extraordinary detail, including various microphysiological systems that represent multiple organ types. FDA has disregarded these technologies and stuck instead with archaic requirements that require killing dogs without justification.

47.     Congress also recognized these significant scientific advancements in medical technology that have reduced the need for extensive (and often cruel) animal testing in service of drug approval. While FDA's governing statute seemingly made animal tests a prerequisite for establishing a drug's safety, in 2022, Congress passed the FDA Modernization Act 2.0 specifically to reverse that conclusion. Congress clarified that acceptable nonclinical tests include those "conducted in vitro, in silico, or in chemico, or a nonhuman in vivo test." FDA Modernization Act 2.0. *See* Pub. L. No. 117-328, div. FF, tit. III, sub. B, ch. 1, § 3209 (2022). The Act expressly encourages the use of various alternatives to lethal animal testing as the means of satisfying the statute's

12

nonclinical testing requirement, including "Cell-based assays;" "Organ chips and microphysiological systems;" "Computer modeling;" "Other nonhuman or human biology-based test methods, such as bioprinting;" and, as a last resort, "Animal tests." 21 U.S.C. § 355(z).

48.     For years after the FDA Modernization Act 2.0 was passed, FDA did not update its regulations or guidance to conform to the FDA Modernization Act 2.0.

49.     On April 10, 2025, Commissioner Makary announced a new policy governing FDA's approach to animal testing. According to that announcement, "FDA's animal testing requirement will be reduced, refined, or potentially replaced using a range of approaches, including AI-based computational models of toxicity and cell lines and organoid toxicity testing in a laboratory setting (so-called New Approach Methodologies or NAMs data). Implementation of the regimen will begin immediately for investigational new drug (IND) applications, where inclusion of NAMs data is encouraged."[3]

50.     On March 18, 2026, FDA released draft guidance on the use of non-animal models (also called new approach methodologies or NAMs). *See* Ex. 7, FDA, Guidance for Industry, General Considerations for the Use of New Approach Methodologies in Drug Development (Mar. 18, 2026),   www.fda.gov/regulatory-information/search-fda-guidance-documents/general-considerations-use-new-approach-methodologies-drug-development (NAMs Guidance). FDA did not reference or expressly rely on the Commissioner's announced policy or this draft guidance in its partial clinical hold letter. And FDA still has not disavowed or rescinded the ICH Guidance that directly contradicts Congress's revisions to the FDCA.

---

[3]     Ex. 6, News Release, FDA, *FDA Announces Plan to Phase Out Animal Testing Requirement for Monoclonal Antibodies and Other Drugs* (Apr. 10, 2025), https://www.fda.gov/news-events/press-announcements/fda-announces-plan-phase-out-animal-testing-requirement-mono-clonal-antibodies-and-other-drugs.

#### 4. *Gastroparesis guidance*

51. In 2015, FDA issued draft guidance addressing FDA's recommendations regarding clinical trial designs to support the development of drugs for gastroparesis. *See* Ex. 8, FDA, *Gastroparesis: Clinical Evaluation of Drugs for Treatment, Guidance for Industry* 1 (July 2015), perma.cc/KN5C-EYUE (2015 Guidance). At that time, FDA called for "a placebo-controlled long-term safety study of 12 months' duration" to be conducted before submitting an NDA. *Id.* at 4.

52. In response to the 2015 Guidance, numerous stakeholders and organizations dedicated to studying gastrointestinal disorders told FDA that a 12-month, placebo-controlled safety study would be "unnecessary," "excessive," "not practical," "hard to accomplish," and "hard to justify to patients," "given the chronic relentless nature of the symptoms." *See* Vanda Opening Submission, Docket No. FDA-2024-N-5933 at 115-116 (Mar. 17, 2025) (collecting comments).

53. FDA published revised guidance in 2019. Ex. 9, FDA, *Gastroparesis: Clinical Evaluation of Drugs for Treatment: Guidance for Industry (Draft)* 2 (Aug. 2019), perma.cc/5W97-3X22 (2019 Guidance). In the 2019 Guidance, FDA—presumably in response to those comments—removed its recommendation that the safety study be "placebo-controlled," and instead recommended a "randomized, controlled, long-term safety study of 12 months' duration."

### B.   Factual background

#### 1. *Gastroparesis and its symptoms*

54. Gastroparesis is a devastating disease. Gastroparesis is characterized by delayed gastric emptying, which causes gastroparesis patients to experience severe distress from eating, including nausea, bloating, and uncomfortable feelings of fullness. For the typical gastroparesis patient, after food rots in his or her stomach, the patient will violently vomit—and that cycle repeats constantly. Gastroparesis causes constant and oppressive nausea of a magnitude so severe

14

and recurrent that everyday activities—working, spending time with family, and basic travel—can become functionally impossible.

55.    Patients often find that the nausea, discomfort, and pain associated with gastroparesis interfere with their employment, social lives, and ability to maintain normal eating patterns. In one study of 1,423 adult patients, 45.5% reported that they were not working or were working limited hours due to their gastroparesis. *See* Ex. 10, Daohai Yu, et al., *The Burdens, Concerns, and Quality of Life of Patients with Gastroparesis*, 62 Dig. Dis. Sci. 879, 883 (2017). Symptoms frequently lead to emergency room treatment and hospitalization for dehydration.

56.    FDA itself has recognized the serious nature of gastroparesis—and the unmet need for treatment options. As FDA explained, "[d]etermining whether a condition is serious … is based on whether the drug will have an impact on such factors as survival, day-to-day functioning, or the likelihood that the condition, if left untreated, will progress from a less severe condition to a more serious one." *See* Ex. 11, FDA, *Fast Track* (Jan. 4, 2018), perma.cc/E83B-6KYF. In its 2019 guidance document on gastroparesis, FDA stated "[t]here is an urgent medical need for development of safe and effective therapies to treat patients with gastroparesis." Ex. 9, FDA, *Gastroparesis: Clinical Evaluation of Drugs for Treatment: Guidance for Industry (Draft)* 2 (August 2019), perma.cc/5W97-3X22.[4]

57.    There currently are no FDA-approved drugs to treat idiopathic gastroparesis. There are no long-term treatment options for diabetic gastroparesis, either.

---

[4]    Recognizing that gastroparesis is a serious unmet medical need, FDA has also previously approved Fast Track designations for two drugs intended to treat gastroparesis. *See* Ex. 12, Steve Duffy, *Fast Track Designation Granted to Novel Gastroparesis Therapy*, MPR (Dec. 6, 2016), perma.cc/Q552-PTRU (discussing Fast Track designation of velusetrag); Ex. 13, Press Release, *Allergan to Acquire GI Disease Subsidiary of Rhythm Holding Company, LLC, Expanding Innovative Gastroenterology Pipeline*, Allergan (Oct. 27, 2016), perma.cc/C2RC-RUH8 (discussing Fast Track designation of relamorelin).

58. There is one FDA-approved drug indicated for the treatment of diabetic gastroparesis, but it is associated with serious adverse reactions that prevent long-term use. The FDA-approved label for Reglan (metoclopramide) bears a boxed warning—FDA's most serious warning—regarding the risk of developing tardive dyskinesia (TD), a serious movement disorder that is untreatable and often irreversible. *See* Ex. 14, Reglan (metoclopramide) Label at 2, perma.cc/4W7L-3P62. The warning recommends avoiding treatment for longer than 12 weeks because of the risk of developing TD with longer-term use. Reglan is also subject to a Risk Evaluation and Mitigation Strategy (REMS) requiring that a guide for patients be distributed with the drug. *Id.*; Ex. 15, Letter from Joyce Korvick, FDA, to Mary Alonso, Alaven Pharm. (Sept. 4, 2009), perma.cc/M8UC-MZ9S. A REMS is necessary when a particular risk or risks associated with a medication may outweigh its benefits and additional interventions beyond FDA-approved labeling are necessary to ensure that the drug's benefits outweigh its risks. Ex. 16, FDA, *Frequently Asked Questions (FAQs) about REMS*, perma.cc/NPU8-FXYH. Reglan's approval was based on trials conducted over three decades ago.

59. Clinicians have also prescribed certain anti-nausea and anti-vomiting drug therapies "off-label" to alleviate patients' gastroparesis symptoms, but they too are associated with various limitations and side effects. Aprepitant is one medication that has shown some effectiveness in reducing nausea associated with gastroparesis. Aprepitant is approved in the United States for only two specific uses: (1) prevention of post-operative nausea and vomiting, and (2) prevention of acute and delayed nausea and vomiting associated with chemotherapy when used in addition to other medications. *See* Ex. 17, Highlights of Prescribing Information – Emend (aprepitant) Label at 2-3, perma.cc/ZA2M-G3HY. The aprepitant label, however, warns that the medication was not

investigated for treating long-term nausea and vomiting and advises against chronic, sustained administration. *Id.* at 3.

60. Domperidone was another possible treatment option. It is not FDA-approved, but was previously available pursuant to an expanded access (or "compassionate use") investigational new drug application. *See* Ex. 18, FDA, *The Voice of the Patient: Functional Gastrointestinal Disorders* 10 (Jan. 2016), perma.cc/LE2G-HDF6. Domperidone, however, is associated with serious cardiovascular risks, including sudden cardiac death, and in September 2025 became unavailable for expanded access patients due to a change in supplier ownership. *See* Ex. 19, FDA, *How to Request Domperidone for Expanded Access Use* (Aug. 24, 2025), perma.cc/9CSD-DCBX.

61. Erythromycin is not approved for treatment of gastroparesis but is sometimes used off-label to treat the disease. Erythromycin generally loses its effectiveness against gastroparesis symptoms after a few weeks of treatment. *See* Ex. 20, Hasse Abrahamsson, *Treatment Options for Patients with Severe Gastroparesis*, 56 Gut 877, 878 (2007), perma.cc/END7-4M4T.

62. In short, each treatment option comes with either serious safety risks, little benefit, or both.

63. Because there are so few treatment options for gastroparesis, many patients resort to using so-called "rescue" medications to manage their symptoms. These may include Zofran (ondansetron) (a medication used to stop chemotherapy-induced nausea and vomiting) or Phenergan (promethazine) (an antiemetic), and they seldom provide meaningful relief. When they do alleviate symptoms, they do not restore patients' general wellbeing.

### 2. Nereus$^{TM}$ (tradipitant) shows promise in treating gastroparesis

64. In 2012, Vanda licensed tradipitant, a novel neurokinin-1 (NK-1) receptor antagonist, from Eli Lilly and Company. Tradipitant has been studied extensively since 2003 for multiple conditions, and FDA approved it in 2025 for the prevention of vomiting induced by motion.

17

65.    In 2016, Vanda began studying Nereus[TM] (tradipitant) as a treatment for symptoms of gastroparesis, under an Investigational New Drug (IND) application.

66.    After years of preclinical study and phase 1 trials, on April 15, 2019, Vanda released its Clinical Study Report for a phase 2 clinical trial evaluating Nereus[TM]'s treatment effect in gastroparesis patients over four weeks of treatment. Study 2301 was a four-week study that enrolled 152 patients (after screening 446) at 47 sites across the country. This study overwhelmingly demonstrated Nereus[TM]'s efficacy in treating nausea associated with gastroparesis. Statistical significance existed across various primary and secondary endpoints, including weekly nausea severity scores, number of nausea-free days, duration of nausea, and other symptoms. *See generally* Study 2301 Report. These findings and measures of clinical meaningfulness were confirmed and published in a peer-reviewed medical journal. *See* Ex. 21, Jesse L. Carlin et al., *Efficacy and Safety of Tradipitant in Patients with Diabetic and Idiopathic Gastroparesis in a Randomized, Placebo-Controlled Trial*, 160 Gastroenterology 76 (2021).

67.    Vanda then conducted a phase 3, 12-week, multicenter, randomized, double-blind, placebo-controlled study to assess the efficacy of Nereus[TM] in relieving symptoms of gastroparesis (Study 3301). Study 3301 demonstrated numerical improvement in the nausea severity score greater than that observed with placebo at Week 12. This data, though not statistically significant, was consistent with the findings from Study 2301. Secondary endpoint data gathered during this study further showed Nereus[TM]'s effectiveness, as patients' change in baseline for various nausea and vomiting scores also numerically favored Nereus[TM] over placebo. Study 3301 Report at 62.

68.    Vanda had initially sought to conduct Study 3301 as another four-week study. But FDA insisted that Study 3301 last twelve weeks, despite Vanda expressing concern that a study of

18

that length would likely produce increased placebo response. Experts believe that, in the gastroparesis context, a 12-week placebo-controlled study is more likely to lead to higher placebo responses because patients assigned to placebo resort to taking rescue medication during the study period, which in turn erroneously hinders the ability to observe a separation between drug and placebo. In fact, FDA's prior guidance from its approval of metoclopramide for the treatment of acute and recurrent diabetic gastroparesis recognized that a study duration of longer than three weeks would inflate the placebo response. This accords with one expert's estimate that the placebo response rate in gastroparesis trials is almost 30%. First Abell Decl. ¶ 41.[5] Another expert describes a systematic review and meta-analysis of 23 trials of treatment for chronic idiopathic constipation, which showed a placebo response ranging from 4% to 44%. First Camilleri Decl. ¶ 159.

69.     Another cause of high placebo response for longer-duration gastroparesis studies is an inflated baseline. Study 3301 used a screening criterion of "at least one vomiting episode" during the screening period to ensure that Nereus[TM]'s effect was assessed for patients with moderate to severe symptoms. But because patients with gastroparesis currently have no adequate treatment, many of them have a strong desire to participate in clinical studies to obtain relief. Due to their strong desire to participate, some patients who sign up for clinical studies report having more severe symptoms (such as vomiting episodes) in order to qualify. Once part of the study, such patients more accurately report their symptoms—resulting in the appearance of a large improvement in symptoms for placebo-treated patients.

---

[5]    Unless otherwise stated, all expert declarations are those submitted with Vanda's opening or reply submissions in support of summary judgment or for a hearing on approvability in FDA proceeding No. FDA-2024-N-5933 and are therefore part of the administrative record and were before FDA when it issued the partial clinical hold.

70.    In further assessing the data received from Study 3301, Vanda determined that certain confounders had likely masked Nereus™'s true effect by inflating the placebo effect. Accordingly, Vanda conducted additional analyses to further isolate and understand Nereus™'s effect.

71.    First, Vanda considered data from a subgroup that excluded those without adequate exposure to the drug—*i.e.*, those whose bloodstream levels of the drug did not reach the levels that Vanda expects to be efficacious. This subgroup revealed the significant improvement attributable to Nereus™; namely, statistically significant improvements in nausea severity (the primary endpoint) at Weeks 2 and 4, numerically superior improvement over placebo at Week 12, as well as statistically significant improvement in percentage of nausea-free days at Week 2 and numerical superiority relative to baseline at Weeks 4 and 12.

72.    Second, Vanda analyzed the No-Rescue Medication subgroup under the theory that unbalanced, outsized use of rescue medication in the treatment population would obscure favorable Nereus™ results when compared against placebo. For good ethical reasons, gastroparesis patients who are suffering should be, and were, permitted to take a rescue medication in the hopes of alleviating their symptoms. The price, however, is data quality: allowing rescue medication introduces factors that can influence the final results. To adjust for the use of rescue medication, Vanda analyzed data from only the patients who did not take rescue medication. Removing the impact of rescue medication, *i.e.*, looking at patients who were taking only placebo or Nereus™, revealed a clinically meaningful and statistically significant effect for nausea severity at week 12 (the pre-specified primary endpoint) with Nereus™ showing a larger improvement than placebo. The no-rescue medication group also showed a statistically significant impact on overall gastroparesis symptoms, as measured by secondary study endpoints.

73.     In addition, between July 2019 and November 2022, the open-label extension phase of Study 3301 enrolled 389 patients. The results of this open-label extension study demonstrated statistically significant improvements from baseline in average nausea severity score and percentage of nausea-free days after 12 weeks of treatment with Nereus™.

74.     There is also an ongoing expanded access program for patients with gastroparesis, under the study protocol for Study 3303. The program consists of multiple single-patient expanded access protocols for administering Nereus™ to patients with gastroparesis. Patients in the program return to the clinic for screening every two months for the first year, and every six months thereafter, while receiving Nereus™. As of April 27, 2026, 16 patients had used expanded access Nereus™ for more than 24 months, 13 patients for between 12 and 24 months, 19 patients between 6 and 12 months, and 18 patients for fewer than 6 months. Across these 66 patients, there has been a cumulative exposure of approximately 92.8 years, and there have been very few reported side effects and no severe treatment-related adverse events.

75.     Vanda submitted its tradipitant NDA (NDA No. 218489) on September 18, 2023. Vanda submitted substantial evidence of tradipitant's safety and efficacy in treating symptoms of gastroparesis, including the results of Studies 2301 and 3301. Two clinicians and leading researchers in treating gastroparesis, Dr. Michael Camilleri and Dr. Thomas L. Abell, submitted declarations in support of Vanda's NDA, explaining their opinions that Vanda's studies demonstrated tradipitant's efficacy in treating gastroparesis.

76.     In addition to its clinical studies, Vanda supplied additional confirmatory evidence of Nereus™'s efficacy. For example, a pooled study of patients in Studies 2301 and 3301 over three weeks showed a statistically significant improvement in the primary endpoint of change of nausea severity from baseline as well as across a number of measures of disease severity. Vanda

also submitted confirmatory evidence from studies it had conducted showing Nereus[TM] significantly improved patients' motion sickness symptoms.

77.    Further evidence from peer-reviewed journals outside of Vanda's NDA submission supports the effectiveness of NK-1 receptor antagonists like Nereus[TM] for treating nausea and vomiting. For example, a recent article in the British Journal of Clinical Pharmacology reviewed animal and human studies of NK-1 receptor antagonists and reported that multiple studies of NK-1 receptor antagonists (including Nereus[TM] and related compounds like aprepitant) demonstrated significant reduction in overall gastroparesis symptom scores relative to placebo. Ex. 22, Paul L. R. Andrews, John F. Golding & Gareth J. Sanger, *An Assessment of the Effects of Neurokinin[1] Receptor Antagonism Against Nausea and Vomiting; Relative Efficacy, Sites of Action, and Lessons for Future Drug Development*, 89 British J. Clinical Pharmacology 3468, 3476 (Dec. 2023). The authors further describe the possible mechanism of action for NK-1 receptor antagonists to reduce nausea. *Id*. at 3477.

### 3.    *Nereus[TM]'s safety record*

78.    Nereus[TM] also has been shown to be safe to use. It has been studied in 14 preclinical studies in both rodent and non-rodent species, in a total of 3,669 animals. Some of these studies were toxicity studies, which attempted to discover the level of drug concentration within the body at which adverse health effects emerge. The findings from these studies—which involved dosing of the drug at concentrations many times higher than would ever be used in humans—did not reveal any clinical, laboratory, or pathology evidence of target organ toxicity. Even at the highest dose administered (an 85-fold human equivalent dose in rats and 294-fold human equivalent dose in dogs), no relevant safety observations emerged. Similarly, Nereus[TM] was not harmful in fetal exposure in animal testing even at exceedingly high dose levels beyond what humans would take.

79.     Nereus[TM] has been studied in humans in 11 Phase 1 studies, 8 Phase 2 studies, 3 double-blind Phase 3 studies, 1 open-label expanded access Phase 3 study, and the open-label portion of one ongoing Phase 3 study, in patients and healthy volunteers aged 18 to 75. In combination, more than 2300 individuals have been exposed to Nereus[TM], and more than 900 of those patients have been exposed for more than eight weeks, and some for longer than a year. No significant safety findings were reported in any of these trials.

80.     Finally, Vanda has studied Nereus[TM] using cutting-edge, state-of-the-art non-animal models. Vanda has conducted multiple *in vitro* toxicology studies using microphysiological systems designed to measure liver toxicity and multiple multi-system "organ-on-a-chip" studies to evaluate Nereus[TM]'s safety, which are exactly the kind of modern alternatives to such animal testing that the FDA Modernization Act 2.0 permits. These studies overwhelmingly confirmed what the other preclinical and clinical evidence showed—that Nereus[TM] is safe for human use.

81.     In connection with its NDA, Vanda submitted a comprehensive expert declaration from Dr. James Hickman (Chief Scientist of Hesperos, Inc., and Professor of Nanoscience Technology, Chemistry, Biomolecular Science, Physics and Electrical Engineering and Head of the Hybrid System Laboratory at the University of Central Florida) to contextualize its non-animal studies and address FDA's questions about them.

82.     Dr. Hickman explained how the microphysiological system models Vanda used "provide[] a comprehensive and superior alternative to animal toxicity testing." Hickman Decl. ¶¶ 1-2, 65. Unlike animal models, which often fail to "predict drug-induced toxicity in humans," "microphysiological systems can detect organ toxicity much faster than animal studies by accelerating responses to drug compounds … and provide enhanced predictivity because they utilize organ constructs that are derived from human tissue and … can mimic human physiology and

organ system interactions in a highly controlled environment." *Id.* ¶¶ 65-66. These systems are not only appropriate for predicting the long-term toxicity of Nereus[TM] in humans, but "are as good or better at predicting the long-term toxicology profile of [Nereus[TM]] than a 6- or 9-month toxicity study conducted in a non-rodent animal species, when viewed in combination with Vanda's cumulative safety evidence for [Nereus[TM]], including the animal toxicity studies already conducted." Hickman Decl. ¶ 10; *see also id.* ¶ 53 (explaining that microphysiological systems can "capture delayed-onset human toxicities that may only be identified in a clinical setting after long-term exposure due to the acceleration of the cellular phenotype and hyper-sensitivity of the detection model").

83.     On September 18, 2024, CDER issued a complete response letter to Vanda, indicating that FDA could not approve the application in its current form. On January 16, 2025, FDA published in the Federal Register a Notice of Opportunity for a Hearing on its proposal to refuse to approve the NDA. 90 Fed. Reg. 4748 (Jan. 16, 2025). After receiving submissions from Vanda in support of its request for summary judgment or a hearing, FDA issued a decision denying Vanda's request and refusing to approve the NDA. *See* Agency Decision: Proceeding on Proposal to Refuse to Approve a New Drug Application for Tradipitant, 91 Fed. Reg. 16,007 (March 13, 2026). Vanda has petitioned for review of that decision to the D.C. Circuit.

### 4.     *Vanda's open-label study and partial clinical hold*

84.     On February 2, 2026, Vanda submitted an amendment to the study protocol seeking to begin Study VP-VLY-686-3305 (Study 3305), a 12-month randomized, open-label, multicenter study comparing Nereus[TM] to the current standard of care. On February 12, 2026, Vanda submitted 11 study reports of Vanda's nonclinical, organ-on-a-chip studies to further support the development of Nereus[TM], four of which had not previously been submitted to the IND.

24

85.     On March 9, 2026, FDA sent a letter to Vanda entitled "Deficiency—Potential Hold Issues" regarding the protocol. FDA's letter contained two comments. *First*, FDA wrote that "the totality of the nonclinical information submitted to the IND … supports a maximum clinical trial duration of 3 months with daily dosing of tradipitant" and that FDA was "concerned that the IND does not contain sufficient information to assess the risks to clinical trial subjects for the proposed treatment duration." March 9 Letter at 1. *Second*, FDA asserted that "Study 3305 does not appear to be an adequate and well-controlled trial," and—remarkably, given the results of Vanda's studies (*see* ¶¶ 64-77 *supra*)—that "tradipitant has been studied in one or more adequate and well-controlled trials that strongly suggest a lack of effectiveness." FDA further stated that "as currently designed," it believed that the study results were "unlikely to provide interpretable data about tradipitant's safety and effectiveness that are critical for continued development of tradipitant as a treatment for patients with gastroparesis." *Id.* at 2.

86.     Vanda responded to FDA's letter on March 11, 2026. Vanda explained that FDA's unexplained concerns regarding study duration could not justify a clinical hold and that FDA's further concerns about study design did not "engage with specific elements of the study protocol submitted on February 2, 2026, and … offer[ed] no guidance regarding what design modifications would render the study acceptable for its stated safety objectives." March 11 Letter at 1-2.

87.     Vanda and FDA had a 30-minute teleconference on March 26, 2026, which did not resolve the matter.

88.     On April 3, Vanda received FDA's clinical hold letter. (PCH Letter). FDA repeated its concern that "the available nonclinical data, including the in vitro nonclinical tests submitted on February 12, 2026, do not support daily dosing of tradipitant for the proposed treatment duration

of 12 months." PCH Letter at 1. FDA contended that because the longest duration of animal tox-icity data is from "a 6-month study in a rodent species and a 3-month study in a non-rodent species, … these in vivo toxicity studies support a maximum clinical trial duration of 3 months with daily dosing of tradipitant." *Id.*

89.    With regard to Vanda's *in vitro* non-animal model studies, FDA maintained that "these studies do not provide additional information sufficient to assess risks to subjects in the proposed clinical trial" because they were "only 7-28 days in duration, without data to validate that such durations are sufficient to represent long-term or chronic exposure to tradipitant" (PCH Letter at 2)—despite FDA's pronouncement in guidance just two weeks earlier that such validation is not required for FDA to consider NAMs. FDA also asserted, without scientific basis, that Vanda's studies "serve the purpose of hazard identification but do not contribute to a risk assess-ment for long-term exposure to tradipitant." *Id.* Thus, FDA concluded that "[c]onducting the rec-ommended 9-month toxicity study with daily dosing of tradipitant in a nonrodent species" (i.e., dogs) "would provide a comprehensive approach for both hazard identification and risk assess-ment." *Id.*

90.    In short, FDA mechanically applied its outdated and legally superseded animal test-ing guidance to Vanda's study protocol, notwithstanding the extensive safety record of Nereus™ and arbitrarily dismissed Vanda's further characterization of Nereus™'s safety through its pio-neering use of NAMs.

91.    FDA also claimed authority to place Vanda's open-label study on hold under 21 C.F.R. § 312.42(b)(4), which allows FDA to place any study that it determines is not designed to be adequate and well-controlled on clinical hold, if FDA also finds that "[t]he drug has been stud-

26

ied in one or more adequate and well-controlled investigations that strongly suggest lack of effectiveness." In support of this asserted basis for the hold, FDA repeated its concern about Vanda's study design, again premised on the baffling and unfounded assertion that Vanda's prior trials "strongly suggest lack of effectiveness." PCH Letter at 3. FDA stated that "Study 3305 is not designed as an adequate and well-controlled trial because the study is unlikely to distinguish the effect of tradipitant from other influences." *Id.* FDA further stated that, because the standard of care for gastroparesis is "highly variable" and "not standardized," comparing tradipitant to that standard "is unlikely to allow for an interpretable quantitative assessment of tradipitant's potential effects." *Id.* And FDA asserted, without explanation or elaboration, that "the open-label design is highly likely to introduce bias." *Id.*

92.     FDA recommended that Vanda conduct "a randomized, double-blind, placebo-controlled treatment period of at least 12 weeks to assess efficacy followed by a controlled extension period to provide a total treatment period of at least 52 weeks." PCH Letter at 4. FDA reiterated, however, that it would require "additional nonclinical data"—again referring to the nine-month dog toxicity study—to "support a total treatment period of at least 52 weeks." *Id.* at 4 n.10.

### FDA'S PARTIAL CLINICAL HOLD IS UNLAWFUL

93.     FDA's partial clinical hold is unlawful and should be set aside.

**A.     FDA's decision is arbitrary and capricious.**

94.     Agency action is arbitrary and capricious "if the agency has 'relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). "The reviewing court should not attempt … to make up for such deficiencies," which is to

27

say that the court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* "To survive review under the 'arbitrary and capricious' standard, an agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Tripoli Rocketry Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 81 (D.C. Cir. 2006).

### 1. *FDA's partial clinical hold decision is not adequately explained.*

95. A basic requirement of agency action is "that the agency adequately explain its result." *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995). In other words, "[a]n agency decision is arbitrary and capricious if it is not reasonably explained." *Antilles Consolidated Educ. Ass'n v. Fed. Labor Relations Auth.*, 97 F.3d 10, 15 (D.C. Cir. 2020). This requirement "is not a high bar, but it is an unwavering one." *Judulang v. Holder*, 565 U.S. 42, 45 (2011); *see also Tourus Recs., Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001) ("A fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action.").

96. Here, FDA failed to provide a coherent explanation for its decision.

97. FDA did not meaningfully engage at all with the evidence of Nereus[TM]'s safety that Vanda placed before it. Instead, it made conclusory statements that Vanda's repeat-dose animal toxicity data was of insufficient duration to support its proposed study and that Vanda's non-animal studies "do not contribute to a risk assessment for long-term exposure to tradipitant." PCH Letter at 2. FDA entirely disregarded Dr. Hickman's declaration, which directly addressed FDA's skepticism that non-animal microphysiological system studies 7-28 days in duration could inform understanding of the risk of long-term exposure to tradipitant. *See supra* ¶¶ 81-82. And FDA's criticism fundamentally misunderstands the scientific advantages of these new approach methodologies. Unlike conventional animal studies, which require months or years to manifest delayed

toxicities, microphysiological systems are specifically engineered to accelerate cellular pheno-types and detect organ-level toxicities in a fraction of the time, because the body's natural compensatory mechanisms are absent. As Dr. Hickman explained, these systems "can capture delayed-onset human toxicities that may only be identified in a clinical setting after long-term exposure due to the acceleration of the cellular phenotype and hyper-sensitivity of the detection model." Hickman Decl. ¶ 53. FDA entirely failed to justify its apparent presumption that non-animal studies must run for the same *calendar* length as a traditional non-rodent study to contribute to a risk assessment for long-term exposure to Nereus[TM].

98.  FDA's "lack of effectiveness" explanation was similarly deficient. FDA claimed that Vanda's two prior randomized, double-blind, well-controlled studies "strongly suggest a lack of effectiveness," but no Vanda study has shown a *lack* of effectiveness. FDA essentially concedes this in a footnote, which summarizes its conclusion that Vanda's prior studies "do not provide substantial evidence of effectiveness" for Nereus[TM] for treatment of gastroparesis symptoms (PCH Letter at 3 n.7). Plainly, a conclusion that Vanda has not yet provided substantial evidence of effectiveness is different than a conclusion that these studies strongly suggest lack of effectiveness. Indeed, FDA has previously recognized "a potential therapeutic role for tradipitant" in relieving nausea in gastroparesis patients based on the results of Study 2301. Letter from J. Beitz, M.D., Director, Office of Drug Evaluation III, at 10 (Feb. 28, 2020).

99.  When an agency "fail[s] to provide any coherent explanation for its decision … the agency's action [is] arbitrary and capricious for want of reasoned decisionmaking." *Fox v. Clinton*, 684 F.3d 67, 69 (D.C. Cir. 2012).

100.    This, alone, is enough for the Court to vacate and remand the partial clinical hold. *See Select Specialty Hosp.–Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014) (noting that when "an agency's failure to state its reasoning or to adopt an intelligible decisional standard is ... glaring ... we can declare with confidence that the agency action was arbitrary and capricious").

101.    FDA's reasoning is inadequate in many other ways as well. FDA has overlooked important considerations, departed from stated agency policy without explanation, and made assertions wholly devoid of explanation.

102.    *First*, the ICH Guidance acknowledges that in instances "where significant therapeutic gain has been shown, trials can be extended beyond the duration of supportive repeated-dose toxicity studies on a case-by-case basis." ICH Guidance at 7. Here, there is significant evidence of the therapeutic benefit that Nereus$^{TM}$ can provide to patients with gastroparesis, and an overwhelming safety record based on the studies conducted so far. FDA does not explain why Nereus$^{TM}$ does not meet the standard for allowing clinical studies to be conducted for longer than the repeated-dose toxicity animal studies.

103.    *Second*, FDA does not explain why, even if a particular non-animal study provided only a "yes/no" hazard screen, why a "no" on that screen would not inform the risk to human subjects in a proposed clinical trial, especially when combined with the wealth of human and animal data that Nereus$^{TM}$ already has. The absence of a documented, positive-controlled case in which a 9-month dog study has uniquely revealed a relevant human toxicity not identified in other, shorter animal trials only confirms that FDA's standard for evaluating which studies can contribute to risk characterization is unsupported by science or logic.

104.    ***Third***, FDA's dismissiveness toward Vanda's microphysiological system studies contradicts Commissioner Makary's articulation of FDA's policy on alternatives to animal testing as well as the draft guidance that FDA issued on this very topic just two weeks earlier. FDA has failed to explain why it is not following the Commissioner's statements or its own guidance in its treatment of Vanda's NAM studies specifically.

105.    As noted above (*supra* ¶ 49), Commissioner Makary announced more than a year ago that "FDA's animal testing requirement will be reduced, refined, or potentially replaced using a range of approaches, including AI-based computational models of toxicity and cell lines and organoid toxicity testing in a laboratory setting (so-called New Approach Methodologies or NAMs data). Implementation of the regimen will begin immediately for investigational new drug (IND) applications, where inclusion of NAMs data is encouraged."[6] FDA has also issued new guidance "to facilitate broader integration of NAMs in drug development" and confirming that NAMs "do[] not necessarily need to be validated" to be considered by FDA. NAMs Guidance at 2; *see supra* ¶ 50. And on April 1, 2026, FDA Commissioner Makary posted a video on X.com explaining that reforms FDA has achieved this year include steps to eliminate all unnecessary animal testing. *See* Dr. Marty Makary (@DrMakaryFDA), X.com (Apr. 1, 2026 at 4:02 PM), https://x.com/DrMakaryFDA/status/2039433177752576065.

106.    In the partial clinical hold letter, FDA stated that Vanda's NAM studies were lacking "data to validate" that their durations "are sufficient to represent long-term or chronic exposure to tradipitant" (PCH Letter at 2), despite its own guidance stating that a NAM "does not necessarily

---

[6]    Ex. 7, News Release, FDA, *FDA Announces Plan to Phase Out Animal Testing Requirement for Monoclonal Antibodies and Other Drugs* (Apr. 10, 2025), https://www.fda.gov/news-events/press-announcements/fda-announces-plan-phase-out-animal-testing-requirement-mono-clonal-antibodies-and-other-drugs.

need to be validated" to be considered by FDA, and a "fit-for-purpose" NAM "may adequately address specific toxicological concerns … even if not validated" (NAMs Guidance at 2). Agency decisionmaking that is "internally inconsistent" like this cannot survive arbitrary and capricious review. *See ANR Storage Co. v. FERC*, 904 F.3d 1020, 1028 (D.C. Cir. 2018); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 488 F. Supp. 3d 1219, 1229 (S.D. Fla. 2020) (agency decision lacking "internal consistency" must be vacated and remanded).

107.    ***Fourth***, FDA asserts that the comparison of Nereus™ to the standard of care "is unlikely to allow for an interpretable quantitative assessment of tradipitant's potential effects" because "the standard of care for gastroparesis is highly variable, not standardized, and has limited evidence to support the efficacy and safety of treatment approaches." PCH Letter at 3 & n. 9. But as FDA acknowledges, Study 3305's primary objective is to evaluate the safety of Nereus™. To evaluate safety, the relevant real-world baseline *is* the existing standard of care, with all its variability. Though that variability may cause some complication in the data (and could make it more difficult to compare *efficacy* outcomes between Nereus™ and a variable standard of care), FDA gives no explanation of how it would preclude useful data regarding Nereus™'s *safety*. FDA even admits that the existing standard of care "has limited evidence to support the efficacy and safety of treatment approaches" (PCH Letter at 3)—which should counsel *in favor of* allowing Vanda to do its study to produce more data, not against it.

108.    For the same reasons, FDA's assertion that data from Study 3305 "will not contribute to advancing tradipitant's development for the gastroparesis population" (PCH Letter at 3 & n.8) is completely unfounded. FDA implies that because Study 3305 "is not designed to distinguish the effect of tradipitant from other influences" (*id.*) it necessarily will not contribute *at all* to the

development of Nereus<sup>TM</sup>. This statement is not explained at all—indeed, it makes no sense what-soever, as this would imply that any safety-focused study that does not also measure the effect of the drug on treatment outcomes against placebo cannot contribute to the development of the drug.

109.    ***Fifth***, FDA's reasoning implies that any study that is not placebo-controlled cannot produce useful safety data—which is contrary to FDA's own precedent. FDA has regularly ap-proved drug products to treat chronic conditions based on longer-term data collected as part of long-term open-label safety trials. *See* Weisman Decl. ¶¶ 101-104. Such approvals include:

> (a)    Differin (adapalene gel);[7]
>
> (b)    Sunosi (solriamfetol);[8]
>
> (c)    Vtama (tapinarof);[9]
>
> (d)    Korsuva (difelikefalin);[10]
>
> (e)    Aklief (trifarotene);[11]
>
> (f)    Intrarosa (prasterone);[12]
>
> (g)    Cobenfy (xanomeline/trospium);[13]

---

[7]    *See* Ex. 23, Highlights of Prescribing Information - Differin (adapalene gel) Label at §§ 1, 6.1, perma.cc/X7MQ-MKSD.

[8]    *See* Ex. 24, Highlights of Prescribing Information – Sunosi (solriamfetol) Label at §§ 1, 6.3, 14.3, perma.cc/82MJ-P92H.

[9]    *See* Ex. 25, Highlights of Prescribing Information – Vtama (tapinarof) Label at §§ 1, 6.1, perma.cc/SY46-XHX6 .

[10]    *See* Ex. 26, Multi-Discipline Review – NDA 214916 at 27-28 (Aug. 20, 2021), perma.cc/25US-5RN5.

[11]    *See* Ex. 27, Multi-Discipline Review – NDA 211527 at 31 (Apr. 19, 2017), perma.cc/LD3W-3KXC.

[12]    *See* Ex. 28, Multi-Discipline Review – NDA 208470 at 4 (Nov. 11, 2016), perma.cc/Y6FH-ZZY3.

[13]    *See* Ex. 29, Integrated Review – NDA 216158 at 12, 61 (Sept. 26, 2024), perma.cc/8BTY-8PNB.

(h)    Vagifem (estradiol vaginal tablets);[14]

(i)    Ubrelvy (ubrogepant);[15]

(j)    Viibryd (vilazodone);[16]

(k)    Perseris (risperidone);[17]

(l)    Invega Sustenna (paliperidone palmitate);[18] and,

(m)    Abilify Maintena (aripiprazole);[19]

110.    Indeed, FDA has previously relied on data from long-term, open-label studies to assess safety in drugs approved for other chronic, gastrointestinal conditions such as opioid-induced constipation[20] and IBS,[21] and open-label safety data for Vanda's prior approved drugs.[22] It is "[a] fundamental norm of administrative procedure" that agencies must "treat like cases alike." *Westar Energy, Inc. v. Fed. Energy Regul. Comm'n*, 473 F.3d 1239, 1241 (D.C. Cir. 2007); *see id.*

---

[14]  *See* Ex. 30, Highlights of Prescribing Information – Vagifem  (estradiol vaginal tablets) Label at §§ 1, 12, 13, perma.cc/Z2MW-METQ.

[15]  *See* Ex. 31, Highlights of Prescribing Information – Ubrelvy (ubrogepant) Label § 6.1,perma.cc/SNL6-RJ5V.

[16]  *See* Ex. 32, Highlights of Prescribing Information – Viibryd (vilazodone hydrochloride) Label § 6.1, perma.cc/K9YP-HS7J.

[17]  *See* Ex. 33, Clinical Review – NDA 210655 at 33-34 (July 10, 2018), /perma.cc/XR2K-BQZL. FDA explicitly stated in this review that the 52-week open-label study for Perseris *was* "adequate for assessing long-term safety," even though it was "open-label and lacked a control group." *Id.* at 35.

[18]  *See* Ex. 34, Highlights of Prescribing Information – Invega Sustenna (paliperidone palmitate) Label §§ 5, 14, perma.cc/25QF-4NLV.

[19]  *See* Ex. 35, Highlights of Prescribing Information – Abilify Maintena (aripiprazole) Label §§ 5, 6, perma.cc/T93M-UNP9.

[20]  *See* Ex. 36, Highlights of Prescribing Information – Movantik (naloxegol) Label § 6.1, perma.cc/V6K8-MBTT.

[21]  *See* Ex. 37, Summary Review – NDA 202811 at 40-44 (Aug. 29, 2012), perma.cc/8NRS-Z9EB.

[22]  *See* Multi-Discipline Review – sNDA 22192 Fanapt (iloperidone) at 12, 44 (Jan. 25, 2024).

(the agency's "dissimilar treatment of evidently identical cases ... seems the quintessence of arbitrariness and caprice"). FDA's unwillingness to allow Vanda's open-label safety study to proceed, when FDA has routinely considered data from identical studies in drug approval applications before, is quintessentially arbitrary and capricious.

111.    FDA's statement that the study's open-label design is "highly likely to introduce bias" disregards that any bias could be eliminated by conservatively assuming that all adverse events are drug-related and is also contradicted by FDA's settled practice of relying on open-label safety data in other drug approvals.

112.    *Sixth*, in recommending that Vanda conduct another 12-week, placebo-controlled, double-blinded study, FDA failed to acknowledge, let alone address, the voluminous record evidence that lengthy gastroparesis studies often result in uninterpretable results due to inflated placebo responses.

113.    As described above (*see supra* ¶¶ 54-63), because gastroparesis symptoms are so debilitating, patients assigned to the placebo group may resort to rescue medications or otherwise fail to follow the study protocol, confounding results. Patients desperate for treatment may also inflate their reported symptoms to qualify for clinical trials, only to regress to the mean after enrollment. Thus, "gastroparesis is a condition where long term placebo use is an untenable request. To ask a patient to go without medication, or to take a placebo, for an extended period of time is an impractical and inhumane demand." Second Camilleri Decl. ¶ 131. Although placebo-controlled trials may generally be favored, in this specific patient population, there is no guarantee that Vanda could recruit enough patients for a placebo-controlled 12-month safety study, let alone that such a study would produce any interpretable results.

114.    FDA has received many comments reiterating the same. *See supra* ¶¶ 51-53.

115.    FDA's partial clinical hold letter does not even acknowledge well-known and doc-umented issues with longer-term controlled gastroparesis studies, let alone address them.

116.    ***Seventh***, by calling for a placebo-controlled safety study, FDA departed without acknowledgement from its own 2019 Guidance on study design for gastroparesis treatments. As described above (*see supra* ¶¶ 51-53), the 2019 Guidance removed the 2015 Guidance's recom-mendation that a long-term safety study be placebo-controlled. Instead, the 2019 Guidance recom-mended a "randomized, controlled, long-term safety study of 12 months' duration"—exactly the kind of trial Vanda has proposed. 2019 Guidance at 4. It is the definition of arbitrary and capricious action for FDA to claim Vanda's trial design is not adequate and well-controlled when—unacknowledged in the partial clinical hold letter—FDA endorsed the same trial design in its own guidance.

117.    ***Finally***, FDA says "subjects who would be enrolled in Study 3305 would have no expectation of benefit." PCH Letter at 3 & n.8. This statement appears to be premised entirely on FDA's unsupported description of Vanda's prior studies and FDA's incorrect view that Nereus™ has no clinical benefit for treating symptoms of gastroparesis. Even on FDA's view that Vanda has not shown substantial evidence of effectiveness, subjects have at the very least the same ex-pectation of benefit as do subjects in any clinical study—to possibly access the study drug and contribute to the progression of scientific understanding of the drug.

118.    This claim is also contradicted by FDA's own actions. FDA has authorized dozens of gastroparesis patients to receive Nereus™ daily under Vanda's expanded access protocols—some for more than 12 months, and many for more than 6 months (*see supra* ¶ 74)—with no serious treatment-related adverse events. Under FDA's own regulations governing expanded ac-cess, the agency may grant such requests only upon determining that "*the potential patient benefit*

justifies the potential risks of the treatment." 21 C.F.R. § 312.305(a)(3) (emphasis added); *see also id.* § 312.310. By approving these expanded access protocols for the very same drug, indication, and patient population, FDA has already determined that Nereus™ offers *some* expectation of benefit. The agency cannot now claim the opposite without any explanation for this stark inconsistency. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009) ("[A]n agency's decision to change course may be arbitrary and capricious if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so."). This failure to engage with its own prior benefit determinations for expanded access patients renders FDA's "no expectation of benefit" rationale arbitrary and capricious.

### 2. *FDA's decision is contrary to the evidence before it.*[23]

119.    FDA's decision is arbitrary and capricious because it "runs counter to the evidence before the agency" (*State Farm*, 463 U.S. at 43) in at least four specific ways.

120.    ***First***, FDA failed to engage with the overwhelming human and animal evidence showing Nereus™'s safety. FDA appears to have simply disregarded the considerable evidence from already-conducted human and animal studies pertaining to Nereus™'s safety. FDA cannot disregard Vanda's nonclinical tests and then fall back on its 9-month dog study requirement without rigorously engaging with the evidence before it. FDA may argue that its determination of what

---

[23]    The D.C. Circuit has recognized that, "in their application to the requirement of factual support, the substantial evidence test and the arbitrary or capricious test are one and the same." *Genuine Parts Co. v. Env't Prot. Agency*, 890 F.3d 304, 346 (D.C. Cir. 2018); *see also Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992) ("An agency action is arbitrary and capricious if it rests upon a factual premise that is unsupported by substantial evidence."). Under both standards, "an agency cannot ignore evidence contradicting its position." *Butte Cty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010). Thus, to the extent that Vanda's arbitrary and capricious arguments could fall under the substantial evidence standard, Vanda incorporates and reasserts its arguments under that standard as well.

constitutes "sufficient" evidence to assess safety is a matter of scientific judgment entitled to deference. But no such deference is warranted where, as here, the FDA has failed to "articulate a satisfactory explanation for its action" (*State Farm*, 463 U.S. at 43) by "failing to consider an important aspect of the problem, including evidence that runs counter to the agency's chosen outcome" (*Wilderness Soc'y v. U.S. Dep't of Interior*, 2024 WL 1241906, at *13 (D.D.C. 2024) (citing *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018))). Mechanically applying the ICH Guidance's 9-month non-rodent study requirement without considering the overwhelming positive safety evidence already in the record is not the type of reasoned agency decision that is entitled to deference.

121.    ***Second***, FDA arbitrarily dismissed Vanda's non-animal studies without considering the evidence demonstrating those studies' relevance. That evidence included not only the study reports but also expert declarations from Dr. Hickman and Dr. Weisman that specifically explained why Vanda's microphysiological system studies should be considered at least as informative as the 9-month non-rodent animal study FDA wants Vanda to conduct. Unlike animal models, which often fail to "predict drug-induced toxicity in humans," "microphysiological systems can detect organ toxicity much faster than animal studies by accelerating responses to drug compounds … and provide enhanced predictivity because they utilize organ constructs that are derived from human tissue and … can mimic human physiology and organ system interactions in a highly controlled environment." Hickman Decl. ¶¶ 65-66. These systems are not only appropriate for predicting the long-term toxicity of Nereus™ in humans, but "are as good or better at predicting the long-term toxicology profile of [Nereus™] than a 6- or 9-month toxicity study conducted in a non-rodent animal species, when viewed in combination with Vanda's cumulative safety evidence for [Nereus™], including the animal toxicity studies already conducted." *Id.* ¶ 10; *see also id.* ¶ 53

38

(explaining that microphysiological systems can "capture delayed-onset human toxicities that may only be identified in a clinical setting after long-term exposure due to the acceleration of the cellular phenotype and hyper-sensitivity of the detection model").

122.   ***Third***, FDA's conclusion that Studies 2301 and 3301 "strongly suggest" a lack of efficacy has no support in the evidence.

123.   Among other things, it is undisputed that Study 2301 showed a statistically significant treatment effect on gastroparesis-related nausea. FDA's conclusion seems to be based entirely on FDA's decision not to approve the Nereus™ gastroparesis NDA—indeed, documents explaining that decision are its *only* citations. *See* PCH Letter at 3 & n.8. But the decision whether to approve an NDA is subject to a different standard entirely: the *sponsor* must show there is "substantial evidence" the drug *is* effective, whereas here FDA must show that adequate and well controlled investigations "*strongly* suggest lack of effectiveness." *See* 21 C.F.R. § 312.42(b)(4)(iv). None of Vanda's studies showed a *lack* of efficacy.

124.   It plainly does not follow from FDA's conclusion on an NDA that the sponsor has not yet shown "substantial evidence" of efficacy that the sponsor's studies suggest a *lack* of efficacy—much less "strongly" suggest as much. *Cf. Pulsifer v. United States*, 601 U.S. 124, 149 (2024) ("In a given statute, the same term usually has the same meaning and different terms usually have different meanings." (citing A. Scalia & B. Garner, Reading Law 170–171 (2012))).

125.   FDA's failure to engage with Vanda's evidence, beyond citation to its earlier decisions evaluating those studies under a different regulatory standard, is therefore arbitrary and capricious. And FDA's citation to its other decisions under a substantial evidence standard, without explanation of why the studies also strongly suggest a lack of effectiveness, is conclusory. *Id.* at

346 ("Conclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of our review.").

126. *Fourth*, FDA disregarded the fact that, because gastroparesis symptoms are so debilitating and patients lack adequate treatment, patients have a strong desire to participate in clinical trials for new gastroparesis medication. In studies that impose minimum severity thresholds for enrollment (as Vanda's Study 3301 did) it is well-recognized that subjective symptoms such as nausea and vomiting are commonly inflated at baseline. This phenomenon contributes to an apparently large improvement in symptoms among placebo-treated patients (a statistical effect known as regression to the mean). Vanda conducted three different sensitivity analyses on the data from Study 3301 to account for this effect that demonstrated Nereus™'s statistically significant effect on gastroparesis symptoms. Vanda presented that evidence, along with expert explanation of why these data confirm Nereus™'s efficacy, which FDA has yet to acknowledge or engage with.

127. An agency may not "disregard[] available scientific evidence that is in some way better than the evidence [the agency] relies on." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 998 (D.C. Cir. 2008). And "an agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation." *Genuine Parts Co.*, 890 F.3d at 312; *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706."); *see also Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1023 (D.C. Cir. 1999) (holding that the Secretary's failure to account for the contrary evidence in the record and refusal to use more recent data were arbitrary and capricious actions). Each of FDA's failures alone would render

its partial clinical hold letter arbitrary and capricious—together these failures make that conclusion inescapable.

**B.      FDA's partial clinical hold is contrary to statute.**

128.    In 2022, Congress passed the FDA Modernization Act 2.0, which expressly amended Section 505 of the FDA's governing statute (21 U.S.C. § 355) to permit non-animal safety studies as sufficient to support a drug's approval.[24] The law replaces the prior reference to "preclinical tests (including tests on animals)" with a list of "nonclinical tests" which "may include" "(1) Cell-based assays, (2) Organ chips and microphysiological systems, (3) Computer modeling, (4) Other nonhuman or human biology-based test methods, such as bioprinting, and (5) Animal tests." *Id.*

129.    Senators Rand Paul (R-KY) and Cory Booker (D-NJ), both original cosponsors of the law, emphasized that it would "avoid the needless suffering of countless animals, now that experimental drug testing can be done with modern non-animal alternatives that are more scientifically relevant" and that it represented a "bipartisan effort … that will accelerate innovation and get safer, more effective drugs to market more quickly by cutting red tape that is not supported by current science." Ex. 38, Adashi et al., *The FDA Modernization Act 2.0: Drug Testing in Animals is Rendered Optional*, 136 Am. J. Med. 853, 854 (Sept. 2023).

130.    Nevertheless, FDA continues to adhere to its outdated view even in the face of congressional revision to the FDCA and the statute's express authorization for FDA to consider non-animal toxicity studies as evidence of a drug's safety in humans.

---

[24]    Members of Congress have long expressed concern about reducing FDA's reliance on animal testing. *See* Hearings Before a Subcommittee of the Committee on Appropriations, S. Hrg. 105-858 at 1275 (Mar. 31, 1998) (Prepared Statement of Sara Amundson, Doris Day Animal League) (noting that in 1998, the European Union had already passed a directive to replace animal tests for safety assessments of cosmetics).

131.    Specifically, FDA's partial clinical hold letter explains that its hold is based on "[i]nsufficient information to assess risks to human subjects." PCH Letter at 1. FDA states that the "nonclinical information submitted to the IND includes a 6-month study in a rodent species and a 3-month study in a non-rodent species, which support the maximum clinical trial duration of 3 months with daily dosing of tradipitant" and recommends that Vanda "conduct the previously recommended 9-month toxicity study in a non-rodent species to assess the long-term safety of tradipitant." *Id.* at 2-3.[25]

132.    Without question, FDA based this requirement on the ICH Guidance, which requires that clinical trials lasting longer than two weeks "be supported by repeated-dose toxicity studies of at least equivalent duration" and recommends "6-month rodent and 9-month nonrodent repeat-dose toxicity studies to support dosing for longer than 6 months in clinical trials." ICH Guidance at 7, 8; *see also id.* at 8 (Table 1, footnote d) (noting that in the EU, 6-month non-rodent studies are acceptable).

133.    Nowhere in the ICH Guidance is there scientific evidence or a stated scientific rationale for the utility of studies of this length for predicting the toxicity in humans. And nowhere in FDA's clinical hold letter does the agency provide evidence or a justification for their necessity.

134.    FDA did not consider the other significant nonclinical evidence of Nereus[TM]'s safety in making its determination.

135.    FDA's partial clinical hold is therefore contrary to law and in excess of the agency's statutory authority because it requires non-rodent animal safety testing despite Congress's clear amendment to the law mandating that nonanimal safety testing can be sufficient.

---

[25]    Although FDA notes that Vanda could also conduct "an adequate alternative method that characterizes the long-term risk of tradipitant use at least as well as the recommended study" (PCH Letter at 3), it provides no insight into what such a study would be.

136.    The Administrative Procedure Act (APA) authorizes courts to "hold unlawful and set aside" agency action that is "not in accordance with law" or "in excess of statutory jurisdiction … or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

137.    An agency "'literally has no power to act'—including under its regulations—unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022) (quoting *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). FDA is not authorized to impose additional requirements beyond what is allowed in the statute. *See Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014) (noting the "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate"); *see also Khedkar v. U.S. Citizenship & Immigr. Servs.*, 552 F. Supp. 3d 1, 17 (D.D.C. 2021) (agency acted unlawfully by "following a regulation that, insofar as it operates to create a rule out of harmony with ... statute, is a mere nullity").

138.    "It is well-settled that when a regulation conflicts with a subsequently enacted statute, the statute controls and voids the regulation." *Farrell v. United States*, 313 F.3d 1214, 1219 (9th Cir. 2002). Of course, "[i]t is not an agency's prerogative to disagree with Congressional policy and refuse to implement it." *Rocky Ford Hous. Auth. v. U.S. Dep't of Agric.*, 427 F. Supp. 118, 129 (D.D.C. 1977) (cleaned up). "An administrative agency is required to effectuate, not ignore, Congressional intent, whether the agency agrees with Congress or not." *Id.* And FDA's past practice, "no matter how firmly entrenched, … cannot provide justification for agency action clearly contrary to statute." *Tate v. Pompeo*, 513 F. Supp. 3d 132, 146 (D.D.C. 2021); *see also Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 349 (D.C. Cir. 2019) ("Even an agency's consistent and longstanding interpretation, if contrary to statute, can be overruled. A regulation's age is no antidote to clear inconsistency with a statute.").

139.    Here, FDA's statement that it will accept alternative methods only if they perform at least as well as the 9-month dog study illustrates the agency's unwillingness to conform its standards to changes in the law. As explained above, the FDA Modernization Act 2.0 amended the FDCA to remove the prior requirement that drug sponsors conduct preclinical safety studies in animals, replacing that requirement with acceptance of various nonclinical models. *See supra* ¶¶ 47-50; *see also* 21 U.S.C. §§ 355(i), 355(z). But FDA's partial clinical hold letter states that the agency would be unwilling to even *consider* these alternative methods unless Vanda could supply an alternative that performs "as well as" FDA's recommended 9-month dog study. PCH Letter at 2. This creates an insurmountable catch-22: Vanda would have to conduct the 9-month dog study to validate the alternative models. And if the alternative produced different (or even *better*) results, FDA offers no criteria for determining which dataset better informs human safety, even though the scientific literature on these new methodologies generally (*see supra* ¶¶ 43-47) shows they may provide more human-relevant outcomes than the animal studies FDA demands.

140.    Because FDA's partial clinical hold is based on additional requirements for animal testing that Congress explicitly removed from the agency's governing statute, its action is contrary to law and Congress's express purpose and must be set aside. *See Illinois Commerce Comm'n v. ICC*, 749 F.2d 875, 880 (D.C. Cir. 1984) (agency action is contrary to law if the decision is "inconsistent with the statutory mandate or … frustrate[s] the policy that Congress sought to implement").

**C.    FDA improperly relied on the ICH Guidance as a binding, legislative rule.**

141.    The APA requires agencies to publish in the Federal Register a "notice of proposed rulemaking" before adopting substantive rules, and to "give interested persons an opportunity to participate in the rule making[.]" 5 U.S.C. § 553(b), (c).

142.    The FDCA is clear: if FDA makes an affirmative finding that a drug imposes an unreasonable risk to patients, it can impose a clinical hold. If it does not make such a finding, FDA may impose a clinical hold *only* "for such other reasons as the Secretary may *by regulation* establish." 21 U.S.C. § 355(i)(3)(B)(ii). Thus, to invoke its authority under this section, FDA must establish standards through a proper notice-and-comment rulemaking before it can rely on that rule in a particular individual case.

143.    In its partial clinical hold letter, FDA cited a regulation: "21 C.F.R. § 312.42(b)(2)(i): Insufficient information to assess risks to human subjects." But that regulation does not contain a requirement that drug sponsors conduct non-rodent toxicity studies of a particular length before conducting clinical trials in humans. To the contrary—FDA's regulations require that the IND include "[a]dequate information about pharmacological and toxicological studies of the drug involving laboratory animals or in vitro, on the basis of which the sponsor has concluded that it is reasonably safe to conduct the proposed clinical investigations." 21 C.F.R. § 312.23(a)(8). And that regulation disclaims any inflexible rules, stating instead that "[t]he kind, duration, and scope of animal and other tests required varies with the duration and nature of the proposed clinical investigations," and refers sponsors generally to "[g]uidance documents." *Id.*

144.    FDA regulations note that "[g]uidance documents are available from FDA that describe ways in which [the] requirements [of § 312.23 for adequate information supporting the reasonable safety of a clinical investigation] may be met." 21 C.F.R. § 312.23(a)(8). But FDA's regulations explicitly state that its "[g]uidance documents do not establish legally enforceable rights or responsibilities" and "do not legally bind the public or FDA." 21 C.F.R. § 10.115(d)(1). (This is also a correct statement of governing law—agency guidance documents *cannot* be relied upon as legally binding.) Furthermore, FDA regulations indicate that regulated parties "may

45

choose to use an approach other than the one set forth in a guidance document." *Id.* § 10.115(d)(2). Guidance documents merely "represent the agency's current thinking." *Id.* § 10.115(d)(3).

145. In short, nowhere in FDA's regulations is there a substantive rule requiring that a drug sponsor complete a non-rodent toxicity study of 9 months—or any duration, for that matter—before a study in humans can go beyond three months. All FDA's regulations require is "[a]dequate information about pharmacological and toxicological studies of the drug involving laboratory animals or in vitro, on the basis of which the sponsor has concluded that it is reasonably safe to conduct the proposed clinical investigations." 21 C.F.R. §§ 312.23(a)(8), 312.42(b)(1)-(2).

146. To the extent that the long-term non-rodent study requirement exists at all, it appears only in the ICH Guidance, which has never been adopted as a regulation through notice-and-comment rulemaking, is derived not from U.S. law but from the views of an unelected international body, and has been superseded by statute in any event. But FDA nevertheless relied on the ICH Guidance as a binding rule even though it was not properly issued through the notice-and-comment rulemaking process.[26] *See Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (an "agency pronouncement … will be considered binding … if it … *is applied by the agency in a way that indicates it is binding*") (emphasis added).

147. FDA's consistent practice confirms that it treats the ICH Guidance as a binding rule.

148. Vanda is aware of only one instance in which FDA has departed from this requirement—for Vanda's other study of Nereus[TM] for the acute treatment of vomiting caused by motion

---

[26]  This is not entirely surprising, given that FDA employees are instructed to "not deviate" from guidance documents "without appropriate justification and supervisory concurrence." 21 U.S.C. § 371(h)(1); 21 C.F.R. § 10.115. There is therefore little incentive for FDA reviewers to deviate from guidance even when required by statute, resulting in a purportedly "nonbinding" requirement being applied in every case.

sickness. In that instance, FDA imposed a clinical hold in December 2024 based on its non-rodent toxicity requirement. After lengthy litigation and negotiations with the agency, however, Vanda persuaded FDA to lift the clinical hold on the ground that motion sickness is a non-chronic condition where patients rarely take the drug more than once per week, allowing Vanda to study Nereus™ for longer than 90 dosing days over a two-year period.

149.    But FDA has still never granted an exception to its animal-study requirement for a drug designed to treat a chronic condition.

150.    Indeed, through FOIA, Vanda determined that FDA has not, in fact, granted any meaningful exceptions to the non-rodent toxicity requirement. In 2020, Vanda requested through FOIA "[a]ny records of cases in which the requirement … was waived by FDA or otherwise not required as to a particular drug development program; including the reasoning for the waiver or non-enforcement in each case." Compl. Ex. A, *Vanda Pharms., Inc. v. FDA*, No. 22-cv-1405 (D.D.C. May 19, 2022), ECF No. 1-1.

151.    In response to FOIA litigation commenced after FDA failed to respond to Vanda's request, FDA conducted a search of all NDAs for applications that contained at least one clinical trial with a dosing duration of at least 6 months—that is, those where the ICH M3(R2) Guidance recommends a 9-month non-rodent toxicity study—and excluded categories of applications to which the guidance is irrelevant (such as oncology applications or those relying upon publicly available information or FDA's previous finding of safety). Joint Status Report ¶ 3, *Vanda Pharms., Inc.*, No. 22-cv-1405 (D.D.C. June 20, 2023), ECF No. 23. FDA identified records relating to two drugs (stiripentol and edaravone)—both of which FDA approved based on existing toxicity studies with durations longer than 6 months without 9-month non-rodent toxicity studies.

In neither case did the agency affirmatively permit a new or ongoing 6-month clinical trial without such studies.

152.   FDA's second round of searching revealed two additional drugs: omegaven and SMOFlipid. For omegaven, the drug sponsor asked FDA if clinical experience plus shorter non-clinical studies could support a labeled duration of six months; FDA denied the request. FDA did agree, however, that infusion toxicity studies of longer than 4 weeks were infeasible, and so it "waived" its requirement for a 6-month study. Instead, FDA proposed a different study structure, which the sponsor adopted. The omegaven records thus concerned different studies of different durations—and to the extent relevant, only shows an exception in cases of literal infeasibility. SMOFlipid was even less relevant—the sponsor agreed to conduct a 90-day study in rats but then demonstrated infeasibility and FDA assented to the sponsor's suggestion of a 3-month dog IV toxicity study instead.

153.   None of the examples FDA identified constitute meaningful exceptions to the 9-month non-rodent toxicity study requirement. Yet FDA agreed that it "conducted a search reason-ably calculated to uncover all relevant records and searched all locations most likely to hold rec-ords responsive to the FOIA request." *See* Joint Status Report, *Vanda Pharms. Inc. v. FDA*, No. 22-cv-1405 (D.D.C. June 20, 2023), ECF No. 23. In other words, FDA was unable to find any relevant cases in which it made an exception to the ICH Guidance.

154.   In short, FDA has effectively never allowed a clinical trial to proceed without fol-lowing the ICH Guidance. This is the hallmark of a binding rule in practice. *Gen. Elec. Co.*, 290 F.3d at 385 (binding rule where agency had never accepted an application that did not follow the guidance); *U.S. Tel. Ass'n v. FCC*, 28 F.3d 1232, 1234 (D.C. Cir. 1994) (deviating from policy only eight times in over three hundred cases); *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d

1317, 1321 (D.C. Cir. 1988) (deviating from policy only four times out of approximately 100 cases). FDA's rote application of the ICH Guidance confirms its binding character.

155.    FDA's treatment of the ICH Guidance as a binding rule is doubly improper because the statute governing clinical holds provides that a clinical hold may only be based on (1) a determination that the drug represents an unreasonable risk of safety to the persons who are the subjects of the clinical investigation, taking into account several enumerated factors or (2) "such other reasons as the Secretary may *by regulation* establish." 21 U.S.C. § 355(i)(3)(B)(ii) (emphasis added). A clinical hold that is premised on a blanket rule that a drug sponsor complete a 9-month non-rodent toxicity study before a study in humans can go beyond three months—where that reason has not been established *by regulation*—is thus impermissible.

156.    The "regulation" on which FDA purports to rely states that FDA may impose a clinical hold if the "IND does not contain sufficient information required under § 312.23 to assess the risks to subjects of the proposed studies." 21 C.F.R. § 312.42(b)(1)(iv). Section 312.23, in turn, requires only "[a]dequate information about pharmacological and toxicological studies of the drug involving laboratory animals *or* in vitro, on the basis of which the sponsor has concluded that it is reasonably safe to conduct the proposed clinical investigations." *Id.* § 312.23(a)(8) (emphasis added). This regulation adds virtually nothing to what the statute already requires clinical investigators to submit: "information on design of the investigation and adequate reports of basic information … necessary to assess the safety of the drug for use in clinical investigation." 21 U.S.C. § 355(i)(2)(A). Thus, the substantive standard FDA relied upon to issue the clinical hold here—the ICH Guidance requirement that sponsors conduct non-rodent studies of at least nine months—was never subjected to notice-and-comment rulemaking and appears nowhere in FDA's duly promulgated regulations. *See, e.g.*, *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d

1, 7 (D.C. Cir. 2011) ("[T]he purpose of the APA would be disserved if an agency with a broad statutory command ... could avoid notice-and-comment rulemaking simply by promulgating a comparably broad regulation ... and then invoking its power to interpret that statute and regulation in binding the public to a strict and specific set of obligations.").

**D.      FDA's partial clinical hold was signed by an invalidly appointed officer.**

157.    In our constitutional system of government, only "Officers of the United States" may exercise "significant authority pursuant to the laws of the United States." *United States v. Arthrex*, 594 U.S. 1, 12-13 (2021) (first quoting U.S. Const. art. II, § 2, cl. 2, then quoting *Buckley v. Valeo,* 424 U.S. 1, 126 (1976)).

158.    Thus, "any appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed" by the Appointments Clause. *Buckley v. Valeo,* 424 U.S. 1, 126 (1976) (per curiam); *see also* U.S. Const. art. II, § 2, cl. 2 (an officer may be appointed either by the President with advice and consent from the Senate, or by a "Head[] of Department" in whom "Congress" has "by law vest[ed]" the appointment power).

159.    The Constitution further distinguishes between "principal officers" and "inferior" officers. *See, e.g.*, *Arthrex*, 594 U.S. at 13. "Whether an officer is principal or inferior" turns on the extent to which that officer's "work is directed and supervised … by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Al Bahlul v. United States*, 967 F.3d 858, 871 (D.C. Cir. 2020) (quoting *Edmond v. United States*, 520 U.S. 651, 663 (1997)); *see also id.* (this inquiry involves the "degree of oversight," the extent of "final decisionmaking authority," and "removability").

160.    The constitutionally prescribed manner of appointment for principal officers— "nomination by the President and confirmation by the Senate"—"is also the default manner of

appointment for inferior officers." *Edmond*, 520 U.S. at 660; *Arthrex*, 594 U.S. at 12. But Congress may "by Law vest" the power to appoint an inferior officer "in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. To determine "whether Congress in fact authorized a department head to appoint an inferior officer," courts must "read[] the statute as a whole." *Al Bahlul*, 967 F.3d at 874.

161. Issuing a clinical hold, including the partial clinical hold here, involves the "exercis[e]" of "significant authority pursuant to the laws of the United States" because it is a final decision that binds the agency and third parties. *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (quoting *Buckley*, 424 U.S. at 126); *see also Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 78 (2007) (any "power lawfully conferred by the Government to bind third parties, or the Government itself, for the public benefit" must be exercised by an officer). The decision, moreover, implicates enormously valuable rights, as well as matters of significant public concern. As a result, only a properly appointed officer may issue the clinical hold.

162. The partial clinical hold in this case was not issued by a constitutionally appointed officer.

163. The partial clinical hold on Vanda's Study 3305 was issued by Dr. Matthew Kowalik, MD, the Acting Director of the Division of Gastroenterology, Office of Immunology and Inflammation, within the Center for Drug Evaluation and Research (CDER) and Dr. Nikolay Nikolov, Director of the Office of Immunology and Inflammation, also within CDER.

164. Neither Dr. Kowalik nor Dr. Nikolov was appointed by the President and confirmed by the Senate. *See* Ex. 39, United States Government Policy and Supporting Positions (Plum

Book), 2024, at 68-69 (stating that the only Senate-confirmed FDA official is the Commissioner himself), perma.cc/7BT6-HAKC.

165. Further, neither Dr. Kowalik nor Dr. Nikolov has been validly appointed by a "Head[] of Department." As described above, Congress may authorize "a department head to appoint an inferior officer" through legislation, but that power does not exist absent congressional authorization. *Lucia*, 585 U.S. at 244 n.3; *see Arthrex*, 594 U.S. at 12-13 ("Congress may vest the appointment of [inferior] officers 'in the President alone, in the Courts of Law, or in the Heads of Departments.") (quoting U.S. Const. art. II, § 2, cl. 2).

166. Neither Dr. Kowalik nor Dr. Nikolov could have been validly appointed by a Department Head because they do not occupy a position whose appointment Congress has "by law vest[ed] … in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. That is, "[t]he head of a department has no constitutional prerogative of appointment to offices *independently* of the legislation of congress." *United States v. Perkins*, 116 U.S. 483, 485 (1886) (emphasis added). No statute—neither a specific nor a general one—vests the HHS Secretary with the authority to appoint inferior officers. And there is no statute that vests appointment authority for Dr. Kowalik or Dr. Nikolov's position in any of the constitutionally prescribed alternative authorities.[27]

167. This stands in stark contrast to other components of the Department of Health and Human Services. With respect to the Social Security Administration, for example, the Secretary

---

[27] FDA has pointed to certain statutes in other litigation that it claims provide the Secretary with appointment authority, but these do not give the Secretary the authority FDA claims. For instance, 21 U.S.C. § 379d-3a(a) confers hiring authority for "outstanding and qualified candidates to scientific, technical, or professional positions" and historical reorganization plans from the 1950s and 1960s that reorganized functions within HHS did not authorize appointment of inferior officers. *See generally Kennedy v. Braidwood Management, Inc.*, 606 U.S. 748, 779-789 (2025).

of Health and Human Services is empowered to "*appoint* and fix the compensation of such *officers* and employees … as may be necessary for carrying out the functions of the Secretary under [chapter 7 of Title 42]." 42 U.S.C. § 913 (emphasis added). And in the 21st Century Cures Act, Pub. L. 114–255, § 2033, 130 Stat. 1033, 1057 (2016), Congress specifically authorized the Secretary of HHS to appoint the National Institutes of Health (NIH) Institute and Center (IC) Directors—who are considered inferior officers under Article II, Section 2 of the Constitution. *See* 42 U.S.C. § 284(a)(1); *see also* Ex. 40, Letter from Hon. Cathy McMorris Rogers, Chair, Energy and Commerce Committee, et al., to Secretary Xavier Becerra, U.S. Department of Health and Human Services (July 7, 2023).

168.    Nor can general housekeeping statutes provide the necessary authority; the "power to 'keep house' … is not the same as the power to 'build the house' by appointing officers." *United States v. Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d 598, 622 (D.D.C. 2018).

169.    Congress has not "vested" authority in the Secretary of Health and Human Services to appoint officers to the position held by Dr. Kowalik or Dr. Nikolov. Thus, even if they had been appointed by the HHS Secretary, their appointments would not have been pursuant to power vested by Congress in a proper authority. They therefore cannot validly exercise the authority of the United States, and any actions taken by them in the purported exercise of such authority—including the partial clinical hold here—are void ab initio.

## CLAIMS FOR RELIEF

### COUNT I
### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
### (arbitrary and capricious agency action)

170.    Plaintiff incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

171.    The APA authorizes courts to set aside agency action that is arbitrary and capricious. 5 U.S.C. § 706(2).

172.    An agency must base its actions "on a consideration of the relevant factors" and "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (citations omitted).

173.    Further, "the requirement that agency action not be arbitrary and capricious includes a requirement that the agency adequately explain its result." *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995).

174.    FDA did not adequately explain its decision to issue the partial clinical hold.

175.    FDA's "lack of sufficient nonclinical evidence" justification was deficient. FDA did not meaningfully engage at all with the evidence of Nereus™'s safety Vanda placed before it. Instead, it made conclusory statements that Vanda's repeat-dose animal toxicity data was of insufficient duration to support its proposed study and that Vanda's non-animal studies "do not contribute to a risk assessment for long-term exposure to tradipitant." PCH Letter at 2. And FDA entirely overlooked Dr. Hickman's declaration, which directly addressed FDA's objections to Vanda's non-animal studies. *See supra* ¶¶ 81-82.

176.    FDA's "lack of effectiveness" explanation was similarly incoherent. No Vanda study has shown a *lack* of effectiveness. A conclusion that Vanda has not yet provided substantial evidence of effectiveness is different than a conclusion that these studies strongly suggest lack of effectiveness.

177. When an agency "fail[s] to provide any coherent explanation for its decision … the agency's action [is] arbitrary and capricious for want of reasoned decisionmaking." *Fox*, 684 F.3d at 69.

178. This, alone, is enough for the Court to vacate and remand the partial clinical hold. *See Select Specialty Hosp.–Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014) (noting that when "an agency's failure to state its reasoning or to adopt an intelligible decisional standard is ... glaring ... we can declare with confidence that the agency action was arbitrary and capricious.").

179. FDA's reasoning is inadequate in many other ways as well. FDA has overlooked important considerations, departed from stated agency policy without explanation, and made assertions wholly devoid of explanation. *See supra* ¶¶ 95-118.

180. Agency action also must be set aside where, as here, the agency "has failed to 'examine[] [the] relevant data.'" *Genuine Parts Co. v. EPA*, 890 F.3d 304, 311-312 (D.C. Cir. 2018) (quoting *Carus Chem. Co. v. EPA*, 395 F.3d 434, 441 (D.C. Cir. 2005)). "[A]n agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation." *Id*. at 312.

181. FDA's partial clinical hold runs contrary to the evidence before it—and fails to examine that evidence—in at least four ways.

182. *First*, FDA asserted that there was "insufficient information to assess risks to human subjects." But FDA disregarded considerable evidence before it pertaining to Nereus[TM]'s safety. FDA's failure to address this evidence and provide a reasoned explanation of its clinical hold was therefore arbitrary and capricious.

183. *Second*, FDA's arbitrary dismissal of Vanda's non-animal studies fails to engage with the evidence of how these studies are useful for characterizing the safety of Nereus$^{TM}$ in long-term human trials.

184. *Third*, FDA's conclusion that Studies 2301 and 3301 "strongly suggest" a lack of efficacy cannot be supported by the evidence. Among other things, it is undisputed that Study 2301 showed a statistically significant treatment effect on gastroparesis-related nausea.

185. *Fourth*, FDA disregarded the evidence that the results of Study 3301 must be understood against the backdrop of the well-recognized phenomenon of baseline inflation of symptoms in clinical trials for new gastroparesis medication that impose minimum severity thresholds for enrollment.

186. FDA's unexplained action must therefore be "set aside." 5 U.S.C. § 706(2); *see Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) (noting that while the court has discretion to remand to the agency for further explanation, "unsupported agency action normally warrants vacatur"); *Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 103 (D.D.C. 2025) ("[A]s the D.C. Circuit has repeatedly held, vacatur of the agency action … is the normal remedy under APA section 706." (collecting cases)).

## COUNT II
### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
#### (agency action contrary to law)

187. Plaintiff incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

188. The APA authorizes courts to set aside agency action that is contrary to law. 5 U.S.C. § 706(2).

189. The FDCA, as amended by the FDA Modernization Act of 2022, specifically authorizes, as sufficient evidence to support a drug's safety, nonclinical testing that includes cell-

based assays, organ chips and microphysiological systems, computer modeling, and other nonhuman or human biology-based test methods, as alternatives to lethal animal studies. 21 U.S.C. § 355(z).

190.    FDA's imposition of a partial clinical hold, based on FDA's own insistence that Vanda conduct unnecessary toxicology studies in non-rodent species (i.e., dogs) is therefore unlawful and must be set aside.

### COUNT III
### ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2)
#### (agency action taken without observance of procedure required by law)

191.    Plaintiff incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

192.    Because FDA imposed its partial clinical hold based on the ICH Guidance, which was never subjected to notice-and-comment rulemaking, FDA acted contrary to law (21 U.S.C. § 355(i)(3)(B)(ii)) and without observance of the required notice-and-comment rulemaking procedures (5 U.S.C. § 706(2)(D)).

193.    Before issuing a binding, legislative rule, the APA requires administrative agencies to publish within the Federal Register a "[g]eneral notice of proposed rulemaking" and to "give interested persons an opportunity to participate in the rule making[.]" 5 U.S.C. § 553(b), (c); *see also Utility Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 752 (D.C. Cir. 2001) ("[T]here must be publication of a notice of proposed rulemaking; opportunity for public comment on the proposal; and publication of a final rule accompanied by a statement of the rule's basis and purpose.").

194.    Here, despite characterizing the ICH Guidance as non-binding, FDA plainly treated the ICH Guidance as a substantive rule. FDA may not legally require regulated parties to comply with the ICH Guidance as a legislative rule without first subjecting it to notice and comment. Thus,

FDA's partial clinical hold, based on the ICH Guidance, is agency action taken "without observance of procedure required by law," and must be set aside. 5 U.S.C. § 706(2)(D).

**COUNT IV**
**U.S. CONST. ART. II, § 2, CL. 2**
**(improperly appointed officer)**

195.    Plaintiff incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

196.    FDA's empowerment of Dr. Kowalik and Dr. Nikolov to issue a clinical hold violates the Appointments Clause of the United States Constitution because neither of them is a validly appointed officer of the United States.

197.    Dr. Kowalik and Dr. Nikolov were not appointed by the President with the advice and consent of the Senate. U.S. Const. art. II, § 2, cl. 2. Moreover, neither Dr. Kowalik nor Dr. Nikolov occupies a position whose appointment Congress has "vest[ed]… in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. They therefore cannot be either principal or inferior officers and cannot exercise power reserved to such officers.

198.    The imposition of the partial clinical hold on Study 3305 is an "exercise[] [of] significant authority pursuant to the laws of the United States." *Arthrex*, 594 U.S. at 13 (quoting *Buckley*, 424 U.S. at 126). Thus, the signatory authority issuing the clinical hold must be an officer of the United States appointed pursuant to the Appointments Clause.

199.    Because the power to impose a clinical hold can be properly executed only by an officer, and because Dr. Kowalik and Dr. Nikolov are not properly appointed officers, the clinical hold is unlawful.

200.    FDA's failure to comply with the Appointments Clause renders its action unconstitutional in violation of the Appointments Clause and the separation-of-powers principles recognized by the Supreme Court.

58

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff respectfully requests that the Court enter judgment in its favor and that the Court:

(a)    Hold unlawful and set aside FDA's partial clinical hold for Study 3305;

(b)    Declare that FDA's partial clinical hold for Study 3305 is unlawful, null, and void under the Declaratory Judgment Act, 28 U.S.C. § 2201;

(c)    Award plaintiff attorney's fees and costs; and

(d)    Award plaintiff such other and further relief as the Court may deem just and proper.

Dated: April 27, 2026                                  Respectfully submitted,

/s/ *Paul W. Hughes*
Paul W. Hughes (D.C. Bar No. 997235)
Sarah P. Hogarth (D.C. Bar No. 1033884)
Mary H. Schnoor (D.C. Bar No. 1740370)
Grace Wallack (D.C. Bar No. 1719385)
MCDERMOTT WILL & SCHULTE LLP
500 North Capitol Street NW
Washington, DC 20001
phughes@mcdermottlaw.com

*Counsel for Plaintiff*